IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GPMM, INC., a Nebraska Corporation;<br><br>Plaintiff,<br><br>vs.<br><br>BRENDA THARP, an individual; and<br>NATALIE KOTRC, an individual;<br><br>Defendants. | 8:19-CV-128<br><br>MEMORANDUM AND ORDER |

## I. INTRODUCTION

This case involves a dispute between a catering company and its former employees who left to form their own business. It comes before the court on cross-motions for partial summary judgment. Filing 57; Filing 60. For the reasons stated herein, the Court grants Plaintiff's motion and denies Defendants' motion.

## II. BACKGROUND

Plaintiff, GPMM, Inc. ("GPMM") operates a wedding and catering business. Filing 22 at 1. Defendants, Brenda Tharp and Natalie Kotrc, are former employees of GPMM who left to form their own company, Elegant Edge Events. Filing 22 at 1.

Tharp started working at GPMM as its catering coordinator in October 2016. Filing 58-6 at 4. As catering coordinator, Tharp booked events on behalf of GPMM and ran its wedding-catering arm, Save the Date. Filing 58-6 at 5. Kotrc was the operation manager and was "responsible for overall business functions" of Save the Date and a separate restaurant GPMM ran at Woodmen Tower in Omaha. Filing 58-5 at 4. Together, Tharp and Kotrc were in charge of "running all of the [Save the Date] events, scheduling people to work those events, [and] scheduling bridal fairs." Filing 58-5 at 5.

1

Around Labor Day 2018, Tharp and Kotrc began discussing leaving GPMM in order to start their own catering company. Filing 58-6 at 22-23. Tharp stated they wanted to leave because "[w]e were doing most of the work, all of the work, of where we were currently employed, Save the Date Catering/GPMM, and we could do this on our own." Filing 58-6 at 22.

On October 1, 2018, GPMM informed Kotrc it was terminating her position. Filing 58-5 at 20. Kotrc signed a severance agreement in which she received severance pay and a bonus. Filing 58-5 at 20; Filing 62-5 at 1-4. GPMM and Kotrc agreed her last day of employment would be October 31, 2018. Filing 58-5 at 20; Filing 62-5 at 1. On October 12, 2018, Kotrc and Tharp filed the Certificate of Organization for their new catering company, Elegant Edge Events, with the Nebraska Secretary of State. Filing 22 at 1; Filing 58-6 at 23. On October 22, 2018, Tharp resigned her position with GPMM. Filing 58-6 at 24. Tharp's last day of employment with GPMM was November 3, 2018. Filing 58-6 at 24.

At dispute in this case are a number of incidents that occurred during the period of time after Kotrc and Tharp decided to form Elegant Edge Events and before their employment with GPMM ended.

The first incident involved Save the Date's email and online accounts. Shortly after she started working for GPMM, Tharp created an email address for Save the Date, savethedatecateringandevents@yahoo.com (the "Save-the-Date Yahoo email"). Filing 58-6 at 4. The purpose of the Save-the-Date Yahoo email was "to have communication with [Save the Date's] clients, different people, vendors" although Tharp also used it for some personal things, like school emails or doctor's appointments for her children. Filing 58-6 at 4-5. Tharp used the Save-the-Date Yahoo email to create an account for Save the Date on WeddingWire, a promotional website through which potential customers can locate and communicate with wedding vendors.

Filing 58-6 at 6-7. When a potential client would send a message on WeddingWire, Save the Date would receive an alert message on its linked email account. Filing 58-6 at 15. When Tharp created Save the Date's WeddingWire account, she used Save-the-Date Yahoo email as the linked email. Filing 58-6 at 15-17. However, after Tharp gave notice that she was resigning, GPMM changed the password to the Save-the-Date Yahoo email such that Tharp no longer had access to it or to the messages sent from WeddingWire. Filing 58-6 at 17. At some point after submitting her resignation but before leaving GPMM, Tharp changed the email address associated with Save the Date's WeddingWire account from the Save-the-Date Yahoo email to brenda.eventcatering@gmail.com. Filing 58-6 at 17. Tharp did not tell anyone at GPMM or Save the Date that she had changed the email address associated with the WeddingWire account. Filing 58-6 at 17. Tharp testified she changed the account to be able to continue her work as catering coordinator until her employment with GPMM ended. Filing 58-6 at 17. GPMM tried to log into its WeddingWire account after Tharp's departure but discovered it could not. Filing 62-1 at 2. WeddingWire required GPMM to prove it was the owner of Save the Date in order to regain access to the account and update the email address. Filing 62-1 at 2. GPMM regained access to the WeddingWire account on January 16, 2019. Filing 62-1 at 3; Filing 62-13 at 1.

Also during the timeframe while Kotrc and Tharp were developing Elegant Edge Events but before they had left GPMM, on October 9, 2018, Tharp attended the Wedding Essentials bridal fair on behalf of Save the Date. Filing 58-6 at 30. Tharp collected contact information from the attendees of the bridal shower. Filing 58-6 at 30. One such attendee was Jaylee Niehus, née Lester. Niehus met Tharp at Save the Date's booth at the Wedding Essentials bridal shower. Filing 62-14 at 1. According to Niehus, she then received an email from Tharp on October 16. Filing 62-14 at

3

1. The email came from the email address "brenda.eventcatering@gmail.com." Filing 62-14 at 3. In the email, Tharp stated,

> Hello! We met at the 2018 bridal show at the Mid America Center! You had our awesome roast beef and mashed potatoes! But our big tasting is coming up and I wanted to invite you and 3 friends totally complimentary! We will have many of our most popular menu items!

Filing 62-14 at 3. The email went on to state the tasting would be held on November 14, 2018, from 5:30 to 7:30 PM at a venue called Karen's Fireside. Filing 62-14 at 3. Niehus attended this tasting. Filing 62-14. At the tasting, Tharp told Niehus that Save the Date was changing its name to Elegant Edge Events.[1] Filing 62-14 at 1. After the tasting, Niehus booked Elegant Edge Events for her wedding, which occurred on August 1, 2020. Filing 62-14 at 1.

Tharp also invited other potential clients of GPMM's to the November 14 tasting at Karen's Fireside. For example, a bride-to-be named Kristin Mcintosh sent an inquiry to Save the Date on WeddingWire on September 18, 2018. Filing 62-9 at 3. Tharp responded and sent Mcintosh the address for Save the Date's website. Filing 62-9 at 2-3. On October 12, Mcintosh replied, thanking Tharp for the response. Filing 62-9 at 2. On October 16, Tharp then sent another message on the WeddingWire platform, informing Mcintosh "[w]e also do complimentary tastings!" Filing 62-9 at 2. Tharp stated, "[W]e are doing a testing [sic] event Wednesday, November 14, from 5:30-7:30pm at Karen's Fireside . . . . Just let me know if you can make it!" Filing 62-9 at 2. Pamela Briere, owner of Save the Date, averred that Save the Date did not hold a tasting at Karen's Fireside on November 14.[2] Filing 62-1 at 1.

---

[1] In their Brief in Opposition, Defendants claim this is a disputed fact. Filing 66 at 13. However, they dispute the fact on the basis that GPMM's says that Tharp told Niehus Save the Date was "changing its name" when in reality, Niehus said Tharp told her Save the Date was "transitioning its name" to Elegant Edge Events. Filing 66 at 13. Thus, for purposes of summary judgment, it is not disputed that Tharp told Niehus Save the Date was becoming Elegant Edge Events even if Defendants disagree on the exact phrasing she used to convey this message.
[2] Defendants attempt to create confusion on this issue by arguing that Save the Date sometimes held tastings at Karen's Fireside and implying that the November 14 tasting might have been one such event because Tharp and Kotrc cannot

On October 23, 2018, a potential client named Sean Lewis reached out to Save the Date via its WeddingWire website expressing an interest in scheduling a tasting. Filing 62-10 at 1. The notification of the WeddingWire inquiry went to the Save-the-Date Yahoo email account, which was the linked email at the time. Filing 62-10 at 1. That same day, it was forwarded from the Save-the-Date Yahoo email account to "brenda.eventcatering@gmail.com." Filing 62-10 at 1. On October 25, Tharp replied to Lewis, saying "Hi Sean! I [sic] using this email now:) We are having a tasting coming up that I can send you the invite for or we can schedule a private one for you!" Filing 58-6 at 1. Tharp testified that by "using this email now" she was referring to her "brenda.eventcatering@gmail.com" address. Filing 58-6 at 19. It does not appear that the scheduling of that tasting happened because on January 9, 2019, Lewis reached back out to Save the Date on WeddingWire inquiring about scheduling on a tasting in February. Filing 58-6 at 1. By this time, Tharp had changed the associated email address on Save the Date's WeddingWire account and thus, GPMM did not see this inquiry from Lewis until it regained access to its WeddingWire account on January 16, 2019. Filing 62-1 at 2-3. When Save the Date regained access to its WeddingWire account, the January 9 inquiry from Lewis was located in the "discarded" folder. Filing 62-1 at 2-3; Filing 62-11 at 1.

Also during this timeframe, Tharp emailed a bride named Alexandra Loseke on November 26, 2018, inviting her to a tasting for Elegant Edge Events to be held on December 11. Filing 65-

---

remember the exact date of Elegant Edge Event's tasting at Karen's Fireside but only know it occurred sometime in November of 2018. *See* Filing 66 at 12. However, the undisputed facts are that Save the Date did not have a tasting at Karen's Fireside on November 14, Filing 62-1 at 1, Defendants invited potential clients to and were present at a tasting at Karen's Fireside on that date, Filing 62-9 at 2; Filing 62-14 at 1; Tharp and Kotrc were running Elegant Edge Events by the time the tasting was held, Filing 58-5 at 20; Filing 62-5 at 1; Filing 58-6 at 24; and after this tasting, at least one client, Niehus, contracted with Elegant Edge Events to cater her wedding, Filing 62-14 at 1. Thus, despite Defendants claiming not to remember the exact date of their tasting at Karen's Fireside, the undisputed evidence demonstrates it was Elegant Edge Events, not Save the Date, that held a tasting on November 14.

2 at 2. Tharp wrote that she and Loseke had "met at the Idea Show back in October!" Filing 65-2 at 2.

In another incident at issue in this case, on October 30, 2018, Tharp met with the owner of the Fountains Ballroom, Blaine Muhle. Filing 62-6 at 4. Tharp informed Muhle that she and Kotrc were leaving Save the Date and starting their own catering company. Filing 62-6 at 4. Muhle said she would immediately start referring clients to Elegant Edge Events rather than Save the Date because she trusted Tharp and Kotrc and had worked only with them at Save the Date. Filing 62-6 at 4. Muhle referred a client named Jordan Gillenwater to Tharp. Filing 62-6 at 4. Gillenwater met with Elegant Edge Events on November 1, 2018, and filled out a contract to hire Elegant Edge Events on that day. Filing 62-6 at 4. Gillenwater also attended the November 14 tasting at Karen's Fireside. Filing 62-6 at 4. Elegant Edge Events eventually catered Gillenwater's wedding. Filing 62-7.

Finally, also during this interim period, Kotrc's sister hired Elegant Edge Events to cater an event for disabled children called "Miss Amazing." Filing 58-5 at 18-19. Kotrc testified this happened "towards the end of October" 2018 and that the event was in November. Filing 58-5 at 19.

GPMM filed suit against Tharp and Kotrc, alleging breach of the duty of loyalty, tortious interference with business relationships, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, violation of the Nebraska Junkin Act relating to unlawful restraint of trade, and violation of the federal Computer Fraud and Abuse Act for their actions. *See generally* Filing 1; Filing 16. The parties now cross-move for partial summary judgment.

### III. ANALYSIS

GPMM moves for summary judgment on its claims of tortious interference with a business expectancy, breach of the duty of loyalty, and violation of the Computer Fraud and Abuse Act. Filing 62. Tharp and Kotrc move for summary judgment on GPMM's claims for tortious interference with a business expectancy, breach of the duty of loyalty, unjust enrichment, and violation of the Computer Fraud and Abuse Act. Filing 59.

### A. Standard of Review

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "an absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (citing *Celotex*, 477 U.S. at 323). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to

support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than 'the mere existence of *some* alleged factual dispute'" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

### B. Tortious Interference with Business Expectancy

GPMM first argues it is entitled to summary judgment on its claim for tortious interference with a business expectancy based on Kotrc and Tharp's actions with respect to Niehus, the bride who ended up booking Elegant Edge Events after initially making contact with Save the Date. Filing 62 at 17-18. Tharp and Kotrc argue they did not interfere with GPMM's business relationships because the wedding fair attendees like Niehus were only potential clients and "a mere statistical probability" of booking a client is inadequate to support a claim of tortious interference. Filing 59 at 9-11.

To succeed on a claim of tortious interference with a business relationship, a party must show:

> (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of

8

interference on the part of the interferer, (4) proof that the interference cause the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

*Koster v. P & P Enterprises, Inc.*, 539 N.W.2d 274, 278 (Neb. 1995) (quoting *Wiekhorst Bros. Excav. & Equip. v. Ludewig*, 529 N.W.2d 33, 39 (Neb. 1995)).

GPMM has shown tortious interference with its business expectancy with Niehus. Niehus met Tharp when Tharp was employed by and representing Save the Date at the bridal fair in October 2018. Filing 62-14 at 1. Niehus was interested in and eventually ended up booking a caterer for her wedding. However, Tharp used Niehus's established relationship with Save the Date to contact Niehus and solicit her business on behalf of Elegant Edge Events. In particular, Tharp specifically referenced Niehus's prior contact with Save the Date when she started her email by stating, "We met at the 2018 bridal show. . . ." Filing 62-14 at 3. Tharp then invited Niehus to a tasting, implying it was being held by Save the Date as she had referenced Niehus's prior contact with Save the Date earlier in the email. Then, at the tasting, Tharp told Niehus that Save the Date was changing its name to Elegant Edge Events. Niehus eventually booked her wedding with Elegant Edge Events.

The evidence shows GPMM had a valid business expectancy with respect to Niehus because Niehus had sought out information about a caterer at the fair and was interested in attending a tasting that she thought was being hosted by Save the Date. In contrast to Defendants' contention, this goes beyond being a mere potential client because rather than just attending the bridal fair generally as a part of a pool of potential clients, Niehus had expressed an interest in hiring Save the Date as her caterer specifically and had taken steps to contract with the business she thought was Save the Date. The evidence shows Defendants knew about this valid relationship because Tharp was the one who made contact with Niehus at the bridal fair and solicited her business thereafter. The evidence also shows Defendants committed an unjustified act of

interference when they told Niehus that Elegant Edge Events and Save the Date were one in the same in order to procure her business. The evidence shows that as a direct result of causing the confusion over Save the Date and Elegant Edge Events, Niehus booked Elegant Edge Events for her wedding. Finally, GPMM has shown it sustained damages in the form of the lost profits from Niehus's wedding.[3] Thus, the evidence shows GPMM is entitled to summary judgment on its claim for tortious interference with a business expectancy and Defendants' motion is denied.

### C. Breach of the Duty of Loyalty

The parties cross-move for summary judgment on GPMM's claim for breach of the duty of loyalty. GPMM argues Defendants breached their duty of loyalty by soliciting Niehus, booking the Gillenwater wedding and Miss Amazing event while still employed by Save the Date, inviting WeddingWire contacts to Elegant Edge Events' tastings, and changing the WeddingWire-associated email. Filing 62 at 13-17. Defendants move for summary judgment arguing that GPMM cannot show it would have otherwise booked the clients in question and all of the events Elegant Edge Events booked occurred after Tharp and Kotrc left GPMM's employ. Filing 59 at 11-12; Filing 66 at 29-32. The Court finds GPMM is entitled to summary judgment.

"Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his employment . . . irrespective of the existence of a covenant not to compete or nonsolicitation clause." *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 870 F.3d 774, 786 (8th Cir. 2017). "Such conduct might include soliciting customers of the employer or forming one's own competing business while still working for the employer." *Id.* (citing *Buell, Winter, Mousel & Assocs., Inc. v. Olmsted & Perry Consulting Eng'rs, Inc.*, 420 N.W.2d 280, 283 (Neb. 1988)). "[B]efore the end of his employment, [an employee] can properly

---

[3] GPMM has reserved the question of the precise amount of damages it sustained for trial. Filing 62 at 17.

10

purchase a rival business and upon termination of employment immediately compete." *Prof'l Bus. Servs. Co. v. Rosno*, 680 N.W.2d 176, 189 (Neb. 2004). "He is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." *Id.* (quoting Restatement (Second) of Agency § 393 at 216 (1958)).

Defendants incorrectly focus on whether GPMM would have booked the clients with which they had contact while still employed by Save the Date and whether the events Elegant Edge Events booked occurred before or after Tharp and Kotrc left GPMM. However, the proper inquiry is whether Defendants acted disloyally during their employment, not whether Save the Date lost customers as a result or whether Elegant Edge Events eventually catered weddings with clients they contacted while employed at GPMM. *See W. Plains, L.L.C.*, 870 F.3d at 786 (describing the duty of loyalty). While the viability of the client contacts may factor into the eventual question of damages at trial, it is not a relevant inquiry for determining Tharp and Kotrc's liability for breaching their duty of loyalty to GPMM. Rather, the undisputed evidence shows that while still employed by GPMM, Tharp and Kotrc solicited and booked clients for Elegant Edge Events. The act of recruiting business for Elegant Edge Events while still employed by GPMM is a breach of the duty of loyalty, regardless of when it resulted in Elegant Edge Events actually profiting.

In particular, it is undisputed that Kotrc's last day with GPMM was October 31, 2018, and Tharp's last day was November 3, 2018.[4] Filing 58-5 at 20; Filing 58-6 at 24. On October 16, Tharp invited Niehus and Mcintosh to the Elegant Edge Events tasting at Karen's Fireside. Filing

---

[4] Tharp makes a passing reference to having been "constructively discharged" prior to November 3, 2018, because GPMM restricted her computer access and limited her duties once she gave her notice. Filing 66 at 7. This argument is unavailing as Tharp presents no authority that constructive discharge is a defense to breaching one's duty of loyalty. Even if it were, the evidence shows that despite the tapering of her duties towards the end of her employment, Tharp's undisputed last day with GPMM was November 3, 2018. *See* Filing 58-6 at 24 (Tharp's deposition in which she agrees she did "in fact, work through November 3rd").

11

62-14 at 3; Filing 62-9 at 2. Tharp emailed a bride named Alexandra Loseke on November 26, 2018, inviting her to a tasting for Elegant Edge Events to be held on December 11. Filing 65-2 at 2. Likewise, Defendants booked the Gillenwater wedding on November 1, 2018, while Tharp was still employed by GPMM and the Miss Amazing event at "the end of October" when both Defendants still worked for Save the Date. Filing 62-6 at 4; Filing 58-5 at 18-19. These acts were a form of direct competition with GPMM and constitute a breach of the duty of loyalty.

Additionally, Tharp's action of changing GPMM's WeddingWire login also constituted a breach of her duty of loyalty. By changing the associated email address, Tharp ensured she would continue to receive client inquiries directed at Save the Date. Furthermore, by failing to inform Save the Date that she had changed the associated email address, she ensured GPMM would remain unaware of the missed business opportunities until it thought to inquire from WeddingWire and have its access restored.

Thus, GPMM is entitled to summary judgment on its claim for breach of the duty of loyalty and Defendants' motion on the same claim must be denied.

### D. Unjust Enrichment

Tharp and Kotrc move for summary judgment on GPMM's claim of unjust enrichment. They argue summary judgment is appropriate because they never received any money to which GPMM was entitled because all of the bridal-fair contacts were mere potential customers. Filing 59 at 13-14. GPMM argues Defendants wrongfully gained Niehus's business by using GPMM's resources and name. Filing 65 at 23-25. The Court denies Defendants' motion for summary judgment.

"An unjust enrichment claim embodies the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another." *Marmo v. Tyson Fresh Meats, Inc.*,

457 F.3d 748, 755 (8th Cir. 2006) (citing *Hoffman v. Reinke Mfg. Co.*, 416 N.W.2d 216, 219 (Neb. 1987)). "When the inequitable and unconscionable retention of a benefit occurs, Nebraska law requires the recipient to pay for the reasonable value of the benefit received." *Id.* (citing *Bush v. Kramer*, 173 N.W.2d 367, 369 (Neb. 1969)). "Unjust enrichment requires restitution, which measures the remedy by the gain obtained by the defendant, and seeks disgorgement of that gain." *Id.* (quoting *Trieweiler v. Sears*, 689 N.W.2d 807, 834 (Neb. 2004)).

As set forth above, Defendants improperly solicited and eventually procured Niehus's business. There is therefore no material dispute that any such profits were wrongfully retained by Defendants. Defendants lied to Niehus in order to recruit her business away from Save the Date and eventually performed catering services for her wedding. Thus, Defendants are not entitled to summary judgment on GPMM's claim for unjust enrichment and their motion is denied.

### E. Violation of the Computer Fraud and Abuse Act

Lastly, the parties cross-move for summary judgment on GPMM's claim under the Computer Fraud and Abuse Act ("CFAA"). GPMM argues Tharp[5] is liable for having changed the WeddingWire-associated email without telling it and for having accessed the WeddingWire account after her employment ended in order to delete the Lewis inquiry. Filing 62 at 18-21. Defendants argue the CFAA does not apply and there was no damage because the information on the account was still available when GPMM regained access. Filing 66 at 32-39.

The CFAA "was enacted in 1984 to enhance the government's ability to prosecute computer crimes." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130–31 (9th Cir. 2009) "The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden

---

[5] GPMM withdraws its cause of action under the CFAA against Kotrc. Filing 65 at 26.

13

actions, ranging from obtaining information to damaging a computer or computer data." *Id.* (citing 18 U.S.C. §§ 1030(a)(1)-(7)). The CFAA allows a person harmed by a violation of the Act to maintain a civil action against an alleged violator. *See* 18 U.S.C. 1030(g). In order to make a civil claim under the CFAA, a private plaintiff must prove that the defendant violated one of the provisions of § 1030(a)(1)-(7). In addition to one of the subsections under § 1030(a), "[a] civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)" relating to damages. 18 U.S.C. § 1030(g). GPMM alleges Tharp violated § 1030(a)(5)(A) and § 1030(a)(2)(C). It reserves the issue of damages for trial. Filing 62 at 20-21.

Section 1030(a)(5)(A) provides an individual is liable for having "knowingly cause[d] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[d] damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A). "[T]he term "damage" means any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8). Section 1030(a)(2)(C) prohibits "intentionally accesse[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." *Id.* § 1030(a)(2)(C).

GPMM argues Tharp violated § 1030(a)(5)(A) "when she changed the email associated with Save the Date's WeddingWire account and did not provide that information to GPMM." Filing 62 at 20. This caused GPMM to lose access to the platform and to fail to receive notification emails, resulting in missed client contacts like Sean Lewis's. Filing 62 at 20. Furthermore, after Save the Date regained access to the account by verifying its identity to WeddingWire, it discovered Sean Lewis's January 9, 2019, message in the "discarded" messages folder. Filing 62-1 at 2-3; Filing 62-11 at 1. GPMM argues this means that Tharp accessed the account at some point

14

after January 9, 2019, in order to discard the Lewis contact and this constitutes "exceed[ing] authorized access" in violation of § 1030(a)(2)(C). Filing 62 at 20.

In opposition, Tharp argues past the issues, claiming that because GPMM did not have its own computer network and Tharp used her personal cellphone for business, she cannot be liable for a CFAA violation. Filing 59 at 17. These arguments are unavailing, and Tharp fails to substantiate her arguments with relevant legal support. *See* Filing 59 at 14-17; *see also Brekka*, 581 F.3d at 1136 ("[T]here is no dispute that if [the employee] accessed [the employer]'s information on the [third-party] website after he left the company in September 2003, [the employee] would have accessed a protected computer 'without authorization' for purposes of the CFAA."). Tharp argues that no damage occurred because GPMM could still view the "discarded" messages once it regained access to the account, but this argument is also without merit. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). It does not require that any such damage be permanent. For the period from when Tharp changed the WeddingWire-associated email account until GPMM regained access on January 16, 2019, the availability of its data was impaired and thus it sustained damage within the meaning of the CFAA. *See, e.g.*, *United States v. Grupe*, No. 17CR00901PJSDTS, 2018 WL 775358, at *2 (D. Minn. Feb. 8, 2018) (stating that "[u]nder the plain meaning of the [CFAA] statute, [the victim company]'s inability to log in to [its account] constituted 'damage'" when attributable to the defendant having changed the password); *Just Be Inc. v. Brisendine*, No. 3:18-CV-00537-SB, 2019 WL 2274990, at *2 (D. Or. May 3, 2019), *report and recommendation adopted*, No. 3:18-CV-00537-SB, 2019 WL 2270592 (D. Or. May 28, 2019) ("By altering the login credentials to [the plaintiff]'s Instagram account and subsequently using his unauthorized access to delete content from the account, Brisendine intentionally caused

damage to a protected computer without authorization."). Furthermore, as a result of Tharp's actions, GPMM also sustained damage in the form of the missed opportunity to work with Lewis. The Court agrees the undisputed evidence sets forth a violation of both provisions of the CFAA as GPMM argues. Accordingly, GPMM is entitled to summary judgment on its claim for liability under the CFAA and Tharp's motion on that claim must be denied.[6]

### IV. CONCLUSION

For the reasons set forth herein, the Court grants GPMM's Motion for Partial Summary Judgment, Filing 60, and denies Tharp and Kotrc's Motion for Summary Judgment, Filing 57. Accordingly,

IT IS ORDERED:

1. Defendants' Motion for Summary Judgment, Filing 57, is denied;

2. Plaintiff's Motion for Partial Summary judgment, Filing 60, is granted; and

3. Pursuant to the Court's Order at Filing 54, the parties are ordered to contact the magistrate judge within seven days of the date of this order to schedule a telephone conference to set the pretrial-conference and trial dates.

Dated this 19th day of November, 2021.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge

---

[6] Having reserved the question of damages for trial, GPMM will be required to satisfy the damages prong of the CFAA, 18 U.S.C. § 1030(c)(4)(A)(i), at trial. *See* 18 U.S.C. § 1030(g) (stating "[a] civil action for a violation of this section may be brought only if the conduct involves" one of the listed damages elements).